IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL LISENBY,<br>　　　　Plaintiff,<br><br>　　v.<br><br>OLYMPUS CORPORATION OF THE AMERICAS, *et al.*,<br>　　　　Defendants. | :<br>:<br>:<br>:　Civil No. 5:25-cv-01525-JLS<br>:<br>:<br>:<br>: |

### MEMORANDUM

**SCHMEHL, J.** - */s/ JLS*　　　　　　　　　　　　　　　　　　　　　**FEBRUARY 9, 2026**

Plaintiff brought this action, claiming that the Defendants terminated him in retaliation for trying to prevent one or more violations of the National Defense Authorization Act of 2013 ("NDAA"), 41 U.S.C. § 4712 and in violation of the Pennsylvania Whistleblower Law ("PWL") and the Florida Private Whistleblower Act ("FWA").[1] Presently before the Court is the Defendants' motion to dismiss the Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. For the reasons that follow, the motion is granted.

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of*

---

[1] In a previous case assigned to this Court, Plaintiff claimed that the same Defendants terminated his employment in retaliation for trying to prevent one or more violations of the False Claims Act ("FCA"), and in violation of the PWL and the FWA. See Related Case No. 5:24-cv-01803-JLS (the "Dismissed Case"), ECF No. 1 (Complaint) and ECF No. 9 (Amended Complaint). In a Memorandum and Order dated February 25, 2025, this Court dismissed the FCA claim with prejudice and declined to exercise pendent jurisdiction over the PWL and FWA claims. See Dismissed Case, ECF Nos. 26 and 27. Plaintiff asserts that the "NDAA claim could not have been brought in the [Dismissed Case] because [Plaintiff] was first required to exhaust administrative remedies pursuant to 42 U.S.C. § 4712(c)(2). Plaintiff alleges he exhausted his administrative remedies on March 6, 2025 when the Office of Inspector General of the U.S. Department of Veteran Affairs closed Plaintiff's administrative complaint that was brought under the NDAA. Plaintiff alleges that this action occurred more than a week after the Court dismissed the First Action. (ECF 1-5 at ¶2(a) and (b))." ECF 13 at p. 8.

1

*Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). Only if "the '[f]actual allegations ... raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 540, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense").

Defendants Olympus Corporation of the Americas ("OCA"), Olympus America, Inc. ("Olympus America") and Gyrus ACMI, Inc. ("Gyrus") are wholly-owned subsidiaries of Olympus Corporation ("Olympus"), which has a principal place of business located in Tokyo, Japan. ECF 1-5 at ¶ 9. Plaintiff was employed by Gyrus. *Id*. at ¶ 12. All three Defendants are part of a single enterprise, which also includes Olympus Corporation, Olympus Scientific Solutions, and Olympus Medical Systems Corporation. *Id*. at ¶ 10. All three Defendants receive federal and state financial assistance. *Id*. at ¶ 18. Olympus America is a federal contractor that receives over $85 million annually in federal awards. *Id.* ¶ 19. All three Defendants sell medical device products to the federal government, including to the Department of Veterans Affairs ("VA"). *Id*. at ¶ 20. The VA was Olympus' largest customer in the United States. *Id*. at ¶ 21. A material condition of Olympus' contracts with the federal government and of the federal government's payment for Olympus products is approval of the product by the Federal Drug Administration ("FDA"). *Id*. at ¶ 22. "Specifically, the VA's No Award Checklist, effective May 28, 2015, provides: 'Medical devices must be FDA 510k

2

approved or have a medical device class exemption from this requirement.'" *Id*. at ¶ 23. All three Defendants also sell their products to hospitals and other entities that receive Medicare and Medicaid reimbursements in most or all states, including but not limited to Pennsylvania and Florida. *Id*. at ¶ 24.

From May 2022 through March, 2024, Plaintiff worked for Defendants as their Global Head of Product Development. *Id*. at ¶ 11. He worked primarily from his home in Florida. *Id*. at ¶ 13. His job duties did not include "investigating fraud and compliance issues." *Id*. at ¶16. Based on his extensive experience in senior positions in the medical device field, Plaintiff was very knowledgeable about compliance with the requirements for the approval of medical devices by the FDA. *Id*. at ¶ 27. According to Plaintiff, in 2023, "the FDA issued three warning letters to Olympus entities regarding their failure to comply with FDA standards." *Id*. at ¶ 28. Plaintiff witnessed additional occasions where Defendants failed to comply with FDA requirements, despite representing to the government and to the public that their devices had received approval from the FDA. *Id.* at ¶ 29.

In January, 2024, while investigating the failed clinical test for a product called Quick Clip Pro 2 (QCP2), Plaintiff "learned of numerous systemic failures in Olympus' approach to design, testing, and validation that resulted in failures to conform to FDA standards." *Id*. at ¶ 30. Plaintiff alleges that the first human clinical case of QCP2 in December, 2023 resulted in a 75% product failure rate which resulted in significant patient harm. *Id*. at ¶ 32. According to Plaintiff, "when the clip of QCP2 fails to deploy, a camera becomes stuck inside the patient's body, requiring the surgeon to either cut the clip loose or pull on it until it tears. This results in tissue damage and delay the surgical procedure." *Id*. at ¶ 33. Plaintiff alleges he "witnessed a surgical procedure where a surgeon was yanking on the clip for up to 30 minutes, resulting in

3

tissue damage to the patient." *Id*. at ¶ 34.

Plaintiff alleges that during his subsequent investigation into the failure of QCP2, he discovered many "systemic deficiencies in Olympus' design approach and quality management such as (1) inadequate sample test sizes, (2) insufficient design validations, (3) inadequate supplier controls, (4) lack of test method validations, and (5) lack of process validations." *Id*. at ¶ 36. Plaintiff alleges that these "deficiencies failed to comply with FDA requirements, as set forth in 21 C.F.R. Part 820." *Id*. Plaintiff believed that if Olympus sold QCP2 "in its current state, it would be misrepresenting data to the FDA to obtain approval, as it had done in the past." *Id*. at ¶ 38. Plaintiff claims that the prior version of the QCP2, the Quick Clip Pro 1 (QCP1) was recalled from the US market in May, 2022 "for the exact same reasons that the QCP2 had failed in the first human clinical cases." *Id*. at ¶ 39. Plaintiff alleges that despite the recall, Olympus continued to sell the QCP1 in the United States and in other locations. *Id*. at ¶ 40.

Plaintiff alleges that "Olympus placed QCP1 on a list of close to 100 products called a 'catch-up 510k' list, where Defendants internally acknowledged that they were not meeting FDA regulatory standards, and on which they planned to catch up and file new 510(k) filings." *Id.* at ¶ 41. "While "catch up" 510(k) filings are acceptable within the industry for small changes, a new 510(k) filing is required if the manufacturer changes form, fit, or function, or significant changes have been made to the original 510(k) filing for the device." *Id.* at ¶ 42. Plaintiff alleges that "[t]he products on the "catch up" list had significant material changes to form, fit, and/or function that required new 510(k) filings in order to be FDA compliant. Specifically, new 510(k) filings and/or a voluntary recall of the products were required to address nonexistent device test data, incomplete design history files, missing biocompatibility

4

testing, missing design verification and design validation tests, missing test method validations, incorrect statistical sample sizes, missing sample plans, incorrect risk management classifications, and nonexistent process validations." *Id.* at ¶ 43.

On January 21, 2024, Plaintiff met with Gabriela Kaynor, who at the time was the Global Head of Olympus' Therapeutic Solutions Division and is currently Chief Strategy Executive Officer. *Id*. at ¶ 45. During the meeting, Plaintiff "detailed his findings and concerns related to Olympus' failure to comply with FDA testing and regulatory standards in its product development process, inadequate training of engineers to follow FDA regulatory and testing standards, and his serious concerns with Olympus' medical devices that had already been launched in the market that did not comply with FDA regulatory standards and had been shown to cause patient harm." *Id*. at ¶ 46. Specifically, Plaintiff noted that QCP1 was recalled for the same reasons that QCP2 had failed in the first human clinical cases. *Id*. at ¶ 47. He also "detailed the systemic quality control and fundamental testing issues within Olympus' product development process and his concerns regarding Olympus' violation of FDA testing requirements and compliance standards. *Id*. at ¶ 48.

Plaintiff also raised these same concerns with Mike Callaghan, the Vice President/ General Manager of the GI Endo-Therapy Business Unit. *Id*. at ¶ 49. Callaghan responded "that it was not his call to sell non-compliant products, but rather it was the [Olympus Medical Systems Corporation] Quality department in Japan's call." *Id*. at ¶ 50.

On January 28, 2024, Plaintiff emailed Roggan and Deputy Chief Technology Officer Tomohisa Sakurai ("Sakurai") and provided links to a "proven design methodology called Design for Six Sigma ("DFSS") to address systemic quality issues in product design procedures in order to ensure Olympus would make the necessary changes to be compliant

5

with FDA requirements and address patient safety risks." *Id*. at ¶ 51. He also "noted many documented systemic issues, including late-stage design failures, poor sample size choices, missing product design requirements, poor test method validations, and supplier quality control failures." *Id*. at ¶ 52. In the email, Plaintiff also cited "the QCP2 failure, wherein 75% of clips failed during the procedure and significantly impacted patient safety." *Id*. at ¶ 53. Plaintiff also stated in the email, "I also believe DFSS would ultimately address the major sticking points we are having with the FDA." *Id*. at ¶ 57.

Plaintiff raised his concerns about a lack of product safety and FDA compliance issues during the CTO Management Committee meetings in Tokyo during the week of January 29, 2024 through February 2, 2024. *Id.* at ¶ 58. During the CTO Management Committee meetings, Plaintiff specifically requested a formal meeting with Olympus Executive R & D leaders including Roggan and Sakurai to "discuss DFSS to address significant gaps in Olympic design procedures specific to non-compliance with FDA standards and testing requirements." *Id.* at ¶ 59. After numerous attempts by the Plaintiff, his request for a formal meeting was granted. *Id.*

During the meeting, Plaintiff "detailed the findings of the QCP2 investigation as well as Olympus' systemic product development process issues and non-compliance with FDA standards." *Id*. at ¶ 60.  He also extolled the benefits of the DFSS methodology. *Id*. He made clear that Olympus' systemic errors were causing patient harm, and "gave the specific example of the tissue damage caused to a patient who had the QCP2 stuck inside his or her body for approximately 30 minutes." *Id*. at ¶ 61. Although Roggan did not attend the meeting, Sakurai and other global R&D executive leaders did attend. *Id.* at ¶ 63. While Plaintiff believed that the group acknowledged the "significant compliance and testing gaps in Olympus product

development process" as well as the use of DFSS to address these issues, Plaintiff was informed that any changes would have to be approved by Roggan. *Id*. at ¶ 62.

On February 7, 2024, Roggan stated "that he had not yet reviewed the DFSS methodology, and it should be pre-screened by a Center of Excellence (CoE), a lower-level R & D subcommittee." *Id*. at ¶ 66. To the best of Plaintiff's knowledge, Roggan did not have the DFSS technology pre-screened by CoE. *Id*. at ¶ 67. Nor did Roggan meet with Plaintiff to discuss his FDA compliance and patient safety concerns. *Id*.

On February 12, 2024, Plaintiff met privately with Eric Rainis, Global VP Quality Design and Assurance "to address systemic quality issues within Olympus' product development process, and described how Olympus was not adequately testing products to ensure patient safety, in direct violation of FDA requirements." *Id*. at ¶ 68. Plaintiff further explained to Rainis that "Olympus had an inadequate complaint handling system that was not able to provide a full picture of the extent of patient harm that was occurring in existing products—including those sold to the government—due to a lack of biocompatibility testing, delayed surgical procedures due to product failures, and inadequate quality controls to ensure the products consistently met specifications." *Id.* at ¶ 69. Plaintiff also informed Rainis that he was concerned that Olympus lacked "a Product Development Quality Assurance organization in Japan to adequately check the design of the product and ensure adherence to quality and FDA regulatory standards in the United States." *Id*. at ¶ 70. Although Rainis appeared to agree with Plaintiff's concerns, he told Plaintiff that "process and procedural issues occurring in the Olympus Japan's Quality (OMSC) organization were outside his defined area of responsibility and he had not been able to influence Olympus Japan's Quality organization in OMSC." *Id*. at ¶ 71.

On February 13, 2024, Plaintiff raised his same concerns in a private meeting with Todd Brill, Senior VP Regulatory Affairs. *Id*. at ¶ 72.

On February 14, 2024, Roggan notified Plaintiff that his position had been eliminated as part of a reduction in force. *Id*. at ¶ 75. Plaintiff alleges that Defendants did not eliminate any other positions as part of its reduction in force. *Id*. at ¶ 77.

According to Plaintiff, "Olympus had a strong motive to discharge employees who report fraud and FDA violations, and to immediately remove their access to company documents, given (1) its recent FDA warning letters, (2) a quit tam suit and related criminal charges against OCA involving kickbacks in Latin America that settled in 2016, resulting in a $312.4 million criminal penalty and a $310.8 civil settlement, and (3) a criminal guilty plea in 2018 by Olympus Medical Systems Corporation related to failure to file FDA-required adverse event reports of serious infections, resulting in a fine of $800,000,000 and a criminal forfeiture of $5,000,000." *Id*. at ¶ 80.

Congress through section 4712(a)(1) of the NDAA protects "[a]n employee of a contractor, subcontractor, grantee, subgrantee, or personal services contractor" from discharge, demotion, or other discrimination "as a reprisal for disclosing to a person or [certain governmental] body information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant." 41 U.S.C. § 4712(a)(1).

To state a claim under this provision, an employee must (1) make a protected disclosure

8

(2) to a person specified in the statute, and (3) suffer a reprisal for making the protected disclosure. *See DuPage Reg'l Off. of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 350 (7th Cir. 2023). After establishing these three elements, the employee must further demonstrate that the protected disclosure was a "contributing factor" in the personnel action that was taken against the employee. *Id.*

To make a protected disclosure, an employee must "reasonably believe" that the information they report "is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract[.]" 41 U.S.C. § 4712(a)(1).

In doing so, courts have concluded that the test for whether a plaintiff has demonstrated a "reasonable belief" is, at least in part, an objective one. See *Fuerst v. Housing Authority of City of Atlanta, Georgia*, 38 F.4th 860, 873 (11th Cir. 2022) (an employee must show a "conclusion [that] is not debatable among reasonable people") (citing *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)); see also *Craine v. National Science Foundation*, 687 Fed. App'x 682, 690 (10th Cir. 2017) ("[W]e have explained that the term ['reasonable belief'] includes 'both a subjective and an objective component,' which means "an employee must actually believe in the unlawfulness of the employer's actions and that belief must be objectively reasonable."). Thus, "[a] purely subjective perspective of an employee is not sufficient even if shared by others." *Fuerst*, 38 F.4th at 873.

In his Complaint, Plaintiff alleges that he was discharged for disclosing information that he reasonably believed was evidence of (1) gross mismanagement of a federal contract; (2) a violation of a law, rule or regulation related to one or more federal contracts and (3) a

9

substantial and specific danger to public health or safety. ECF 1-5 at ¶ 83.

With respect to gross management of a federal contract, Plaintiff has failed to allege a single contract, let alone a *federal* contract, that the Defendants grossly mismanaged. He certainly could not allege any federal contract for the sale of the QCP2 because that product was not on the market at the time the events giving rise to the Complaint occurred. Nor can Plaintiff base his claim on the conjecture that *if* the Defendants had sold the QCP2 "in its current state, it would be misrepresenting data to the FDA to obtain approval, as it had done in the past." *Id*. at ¶ 38. "[Section] 4712 [of the NDAA] does not permit an employee to blow the whistle before the foul." *Fuerst*, 38 F.4th at 875.

Plaintiff also does not allege gross mismanagement concerning a *federal* contract with respect to the QCP1. Plaintiff also does not allege that he raised concerns about the sale of the QCP1 at any time. ECF 1-5 at ¶¶ 39-40.

Plaintiff tries to establish the requisite connection to a federal contract by contending that all of Olympus' contracts with the VA require 501(k) approval and the fact that Olympus kept a "catch-up 510k list" was an "internal[] acknowledge[ment] that it was not meeting FDA regulatory standards." [ECF at pp. 10-12.] Plaintiff fails to allege, however, that he raised concerns regarding the sale or marketing of a single 510(k) "catch-up" product that was sold in general and to the VA in particular. Nor does he specify a single change to a particular device that would have warranted a new 510(k) filing.

Nor has Plaintiff adequately alleged that he made a protected disclosure regarding any violation of a law, rule, or regulation related to a *federal* contract. Plaintiff makes a general assertion that he found many systemic deficiencies in Olympus' design and quality

management related to already-sold products such as inadequate test sample sizes, insufficient design validations, inadequate supplier controls, lack of test method validations, and lack of process validations and claims these alleged deficiencies fail to comply with the FDA's Current Good Manufacturing Practices ("CGMP"), set forth in 21 C.F.R. Part 820 (ECF 1-5 at ¶ 36). Plaintiff fails to allege any details as to what the CGMP requires or prohibits, or how Defendants allegedly failed to comply with the CGMP. Indeed, given that Part 820 contains more than 250 subparts, the Court would be hard-pressed to understand exactly which provisions, if any, have any applicability to this case. Even more significant is that Plaintiff has failed to plead that any possible violation by Defendants of 21 C.F.R. Part 820 that is related to a *federal* contract. 41 U.S.C. § 4712(a)(1). Indeed, as noted above, Plaintiff has failed to identify any contract, let alone a federal contract and, therefore, it is not possible for him to demonstrate any type of nexus between Defendant's alleged violations of 21 C.F.R. Part 820 and any federal contract. *See Ficarra v. SourceAmerica*, 2020 WL 1606396, at *4 (E.D. Va. Apr. 1, 2020) (dismissing plaintiff's NDAA retaliation claim where "even assuming [his] disclosure concerns 'a violation of law, rule or regulation,' his disclosure is not 'related to' a DoD, NASA, or other federal contract, nor could plaintiff have reasonably believed that it was.").

Plaintiff's claim that he reasonably believed he made a protected disclosure regarding a specific and substantial danger to public health and safety also fails. Again, Plaintiff makes only general allegations of systemic deficiencies in Olympus' design and quality management without identifying any specific products that are being sold by the Defendants that present a specific and substantial danger to public health and safety. Plaintiff provides no allegations that the one product he does identify as having failed a single clinical trial because the clip failed to

deploy, the QCP2, was ever actually marketed and sold by the Defendants. Indeed, products fail clinical trials all the time. The clinical trial alerts the manufacturer as to any deficiencies or patient risks. As for the QCP1, Plaintiff does not allege that he was involved with that product or that he made any complaints about the QCP1 to Olympus.

Because Plaintiff has failed to allege that he made any protected disclosures based on an objectively reasonable belief that there was evidence of gross mismanagement of a federal contract, a violation of a law, rule, or regulation related to a federal contract, or any substantial and specific danger to public health and safety, he has failed to satisfy the first element for a retaliation claim under the NDAA. *See DuPage Reg'l Off. of Educ. v. U.S. Dep't of Educ.*, 58 F.4th 326, 350 (7th Cir. 2023). Accordingly, the Court need not consider whether the Plaintiff has satisfied the remaining two elements for a retaliation claim under the NDAA and, therefore, the NDAA claim is dismissed, with prejudice.

In Count II, Plaintiff asserts a claim under the Pennsylvania Whistleblower Law ("PWL"), 43 Pa. Stat. Ann. § 1423 (2014). The PWL provides, in pertinent part, that:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee ... because the employee or a person acting on behalf of the employee makes a good faith report or is about to report ... *an instance of wrongdoing or waste by a public body or an instance of waste by any other employer* as defined in this act.

43 Pa. Stat. Ann. § 1423 (2014) (emphasis added).

"To establish a prima facie case under the Whistleblower Law, the plaintiff must prove by a preponderance of the evidence that he made a good faith report of wrongdoing or waste to the appropriate authorities prior to the alleged retaliation." *Sukenik v. Township of Elizabeth*, 131 A. 3d 550, 555 (Pa. Cmwlth. 2016) citing *O'Rourke v. Commonwealth,* 566 Pa. 161, 778

12

A.2d 1194, 1200 (2001).

"Wrongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 Pa. Stat. Ann. §1422.

"Waste" is defined as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id.*

Regarding "wrongdoing," the test for whether an act constitutes wrongdoing "is objective; it is irrelevant whether an employee believes the employer's conduct constitutes wrongdoing, an actual violation is required." *Sukenik*, 131 A. 3d at 556 (citing *Kimes v. University of Scranton,* 126 F.Supp.3d 477, 493 (M.D. Pa. 2015)).

Plaintiff fails to specify any *actual*, material violations of law as required for a PWL claim. It is irrelevant whether Plaintiff himself believes any conduct by Olympus constitutes wrongdoing. With respect to the QCP2 and any other unspecified products, processes or procedures, Plaintiff makes only vague and conclusory allegations that he raised concerns regarding unspecified FDA regulations, including the entirety of the CGMP.

Similarly, regarding "waste," Plaintiff fails to allege any actual conduct or omissions by the Defendants pertaining to a single product that resulted in the substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from the Commonwealth. Instead, Plaintiff alleges in conclusory fashion, that "hospitals and other entities to which Defendants sell their products receive funding from the Commonwealth of Pennsylvania

13

through Medicare and Medicaid." ECF 1-5 at ¶ 88.  Plaintiff further alleges that "Defendants' sales to the government of non-compliant products resulted in substantial misuse or loss of funds belonging to or derived from the Commonwealth of Pennsylvania, namely, Medicare and Medicaid funding" *Id*. at ¶ 92.  However, in *Grim v. May Grant Assocs*., No. 18-2231, 2019 WL 358520, at *6-7 (E.D. Pa. Jan. 29, 2019), this Court dismissed the PWL claim because it contained only "broad conclusions of theoretically wasted Medicare and Medicaid funds" without "sufficient factual matter to allow the Court to conclude this result is possible." *Id*.  Indeed, in this case, Plaintiff does not allege that a single dollar of any funds belonging to the Commonwealth and/or Medicare and Medicaid was lost because of any actions taken by the Defendants. *See Sukenik*, 131 A. 3d at 559 ("[W]hen alleging that a substantial loss of funds constitutes waste, it is clear that some actual loss must occur.").  For these reasons, Plaintiff has failed to state a claim under the PWA.

Plaintiff also asserts a claim for retaliation under the Florida Private Whistleblowers Act ("FWA"), Fla. Stat. § 448.102 (3). "'[I]n order to establish a prima facie case of retaliation under the FWA, [p]laintiff must prove that (1) [he] engaged in statutorily protected expression; (2) [he] suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity.'" *Schmidt v. Disney Parks, Experiences and Products, Inc*., No. 6:23-cv-257-ACC-EJK, 2024 WL 1669815, at *12 (M.D. Fla. Feb. 29, 2024) quoting *White v. Purdue Pharma, Inc.*, 369 F. Supp. 2d 1335, 1336 (M.D. Fla. 2005).

With regard to the first element, "[t]he FWA recognizes three types of protected expression: (1) disclosure, or threatened disclosure, to any appropriate governmental agency, which requires submission of the violation, in writing, to the employer with a reasonable opportunity to correct; (2) providing information to a governmental agency conducting an

14

investigation, hearing, or inquiry into an alleged violation by the employer, or (3) objecting or refusing to participate in an activity, policy or practice of the employer which violates a law, rule, or regulation." citing Fla. Stat. § 448.102. Only the third prong could apply here. "Law, rule or regulation" is defined as "any statute or ordinance or any rule or regulation adopted pursuant to any federal, state, or local statute or ordinance applicable to the employer and pertaining to the business." Fla. Stat. § 448.101(4).

There is a split among Florida's intermediate appellate courts about whether the protected activity prong requires the employee to show an actual violation of the law or merely "a good faith, objectively reasonable belief that his activity is protected by the [FPWA]." For example, Florida's Fourth District Court of Appeal held that a plaintiff need only show a "a good faith, objectively reasonable belief that h[is] activity is protected by the statute." *Aery v. Wallace Lincoln-Mercury, LLC*, 118 So. 3d 904, 916 (Fla. Dist. Ct. App. 2013). On the other hand, Florida's Second District Court of Appeal held that a plaintiff must "prove that he objected to an actual violation of law or that he refused to participate in activity that would have been an actual violation of law." *Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458, 465 (Fla. Dist. Ct. App. 2015).

Here, other than citing in general to the voluminous CGMP and to other unspecified FDA Regulations, Plaintiff failed to articulate what law, rule, or regulation Defendants may have violated and what actions of Defendants violated such law under either the 'actual violation' or 'objectively reasonable belief' standard. The only product Plaintiff identifies that he warned Defendants about is the QCP2 but Plaintiff does not allege that the QCP2 was ever sold by the Defendants to the public.

Because Plaintiff has failed to establish the first element of a prima facie case of

retaliation under the FPWA, i.e., that he engaged in statutorily protected expression, Plaintiff's FWA claim will be dismissed, with prejudice.